**NONPRECEDENTIAL DISPOSITION**
To be cited only in accordance with
Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois  60604**

Argued April 22, 2015
Decided May 13, 2015

**Before**

JOEL M. FLAUM, *Circuit Judge*
DANIEL A. MANION, *Circuit Judge*
DAVID F. HAMILTON, *Circuit Judge*

| | |
|---|---|
| No. 13-3750 | Appeal from the United States District Court for the Central  District of Illinois |
| UNITED STATES OF AMERICA, | |
| *Plaintiff-Appellee,* | No. 13-CR-40001 |
| *v.* | **Sara Darrow**, *Judge*. |
| DARRIUS HAYDEN, | |
| *Defendant-Appellant.* | |

**O R D E R**

Darrius Hayden was convicted of one count of unlawful possession of a firearm by a felon, in violation of 18 U.S.C. § 922(g)(1). At trial, the government introduced a 911 call and statements to police made by the victim, even though the victim did not testify. Hayden argues that this violated his Sixth Amendment right to confrontation because

the victim was not subject to cross-examination by defendant's counsel at any point in the proceeding. We affirm.

## I. Background

Diego Shears was robbed of a necklace and mobile telephone outside a convenience store in Rock Island, Illinois on the morning of December 4, 2012. Moments later, he encountered his cousin, Michael Ross, and informed him that he had just been robbed. Ross had seen Shears and Hayden (whom he knew through mutual acquaintances) speaking as he approached the store, but did not recognize the encounter as a robbery until Shears informed him that it was.

Shears then borrowed Ross's telephone and called 911. He informed the operator of his location and declared that "there's a dude running around with a gun and a black sweater shirt. He just [expletive] robbed me from my phone and everything." App. Br. at A9. The operator then asked a series of questions, including the following:

> Operator:     What was he wearing?
>
> Shears:       He [was] wearing ... [a] gray and black striped hoodie.
>
> Operator:     Did he show a weapon or anything?
>
> Shears:       Hell yeah, he got a big ass black gun.  He just (inaudible) it on my head, (inaudible) drop it off, he going [to] find my ass ...
>
> Operator:     Which way was he walking?
>
> Shears:       He was walking towards the courts ... .

*Id.* at A9–A10.

Shears's 911 call was interrupted by the arrival of Rock Island police officers Phillip Ledbetter and Kris Kuhlman, who had been several blocks away in their patrol vehicle when they heard the call of an armed robbery announced on the police radio.

Seeing them approach, Shears flagged them down while he spoke with the operator. Once the 911 operator ascertained that the police had arrived, the call was terminated. In total, the 911 call lasted approximately two minutes and forty-five seconds.

Speaking to the police, Shears informed them that he had just been robbed and that the suspects had fled through a nearby park. He pointed towards a house at the north end of the park and indicated that the suspects could be located at this residence. Officer Ledbetter suspected that Hayden and his cousin Elliot Cameron were involved in the robbery; he knew the two teenagers from his work in the neighborhood and he remembered having seen Hayden the day before wearing a gray and black striped sweatshirt matching the type described by Shears. The two officers drove towards a nearby house belonging to Cameron's mother.

They parked, dismounted, and approached the house from the back alley. Once there, the officers saw Cameron. Ledbetter approached Cameron, patted him down, and seized a black .40 caliber Taurus handgun from Cameron's waistband. Approximately fifteen minutes later, police obtained consent from Cameron's mother to search the house. Hayden was descending the staircase when they arrived. They found the gray and black striped sweatshirt and blue bandana on a bed in a downstairs bedroom. They also located the gold chain necklace described by Shears underneath a mattress in the upstairs bedroom.

Cameron pleaded guilty to a state charge and testified against Hayden. He testified that he walked with Hayden to the convenience store and identified him from footage from the store's surveillance camera that was taken on the morning in question. He did not witness any robbery because he left the convenience store without Hayden. He also testified that he walked home and did not see Hayden again until Hayden arrived at his mother's house, handed a black handgun to him, and told him to get rid of it. Another witness, Bobby Walker, testified that Hayden hid the necklace under a mattress in an upstairs bedroom.

The government tried to locate Shears but was unable to do so; therefore, he did not testify. In his absence, the government sought to play the recording of the 911 call to the jury and to enter it into evidence through the testimony of Officer Ledbetter. The defense did not object and the trial judge admitted it into evidence. Indeed, the defense

brought two motions in limine, neither of which addressed Shears's statements to Ross, the police, or his 911 call.

The jury convicted Hayden of being a felon in possession of a firearm, and the court sentenced him to 110 months imprisonment, a sentence at the low end of the guideline range. On appeal, the defense argues that the admission of Shears's 911 call and statements to Officer Ledbetter violated Hayden's Sixth Amendment right of confrontation because the statements were testimonial and Hayden had no opportunity before or during trial to cross-examine Shears about those statements. In contrast, the government argues that Hayden waived this issue by failing to lodge an objection at trial.

## II. Analysis

Hayden did not object to the the admission of Shears's 911 call and statements to Ross and the police, so we review the admission of such evidence for plain error. *United States v. Hudson*, 627 F.3d 309, 312 (7th Cir. 2010). Plain error exists where: (1) there was an error; (2) it was plain; (3) it affected the defendant's substantial rights; and, (4) it seriously affected the fairness, integrity, or public reputation of the judicial proceedings. *United States v. Nance*, 236 F.3d 820, 824 (7th Cir. 2000). Each element must be established to constitute plain error. *Id*.

### A.     Confrontation Clause

The Confrontation Clause of the Sixth Amendment (binding on the states under the Fourteenth Amendment) establishes that a criminal defendant has the right to cross-examine any witness who testifies against him. In *Crawford v. Washington*, the Supreme Court held that, with certain exceptions, the Confrontation Clause barred the introduction of "testimonial" statements where the defendant is not afforded an opportunity to cross-examine the witness about the statement at trial or at an earlier proceeding. 541 U.S. 36, 68 (2004).

Here, we decline to address the government's waiver argument because the matter is easily dispatched on its own merits. Statements are non-testimonial when they are made to police under circumstances indicating that the primary purpose of the inquiry is to meet an ongoing emergency rather than to establish or prove past events

relevant to a later criminal prosecution. *Davis v. Washington*, 547 U.S. 813, 822 (2006). It is the primary purpose of the statement at the time it was made that determines whether it is testimonial. For this reason, statements obtained by police to enable them to meet an ongoing emergency are non-testimonial even where those same statements are used later by the prosecution against the defendant at trial. The inquiry into the primary purpose of a statement is an objective one in which a court evaluates the circumstances in which the encounter between the individual and police occurs to determine if there is an ongoing emergency. *Michigan v. Bryant*, 131 S. Ct. 1143, 1156 (2011).

Focusing on the primary purpose of the statements, it is clear that the 911 recording and the statements to the police officers do not fall within the class of statements recognized as "testimonial." *Davis*, 547 U.S. at 822–26. In *Davis*, a victim of domestic violence called 911 as her assailant fled the scene. The Supreme Court held that the recording was non-testimonial and therefore could be admitted even where the caller was not available for trial or cross-examination. The Court noted that: "A 911 call ... and at least the initial interrogation conducted in connection with a 911 call, is ordinarily not designed primarily to establish or prove some past fact, but to describe current circumstances requiring police assistance." *Davis*, 547 U.S. at 827.

Like *Davis*, the 911 call at issue and statements to police were non-testimonial because their primary purpose was to provide police officers with basic information to address an ongoing emergency. The statements occurred within minutes of the robbery while an armed suspect was still fleeing the scene and they provided only basic information that might enable police to capture the suspect. The content of the call was limited to informing police that a robbery had occurred; the location of the robbery; that the robber wore a gray and black striped shirt; that the robber was armed; and that the robber fled in a certain direction. For this reason, the statements were clearly non-testimonial and it was proper for the trial court to allow them into evidence.

Finally, there is Shears's statement to Ross that he had been robbed. Here, there is no suggestion that Ross, who is the cousin of Shears, was acting in any official or law enforcement capacity when he spoke with Shears after the incident. The Supreme Court has never addressed in detail whether (or in which situations) statements to friends or acquaintances qualify as testimonial. Still, none of the factors that normally characterize testimonial statements are apparent here: the statement was not made in response to an

inquiry from Ross about whether a crime had just occurred; no criminal investigation had begun at that point as the incident had occurred only moments before; and the statement formed part of a request for Shears to use Ross's phone to obtain assistance.

For this reason, we need not address the open question of whether statements to acquaintances can be testimonial. It suffices that this one is not because it lacks all the characteristics of a testimonial statement. To hold otherwise would yield the incongruous result of recognizing Shears's statements to his cousin as testimonial, while holding that identical statements to police officers and a 911 operator only moments later were not.

B.      Hearsay

We must also address whether the statements were inadmissable as improper hearsay evidence. Hearsay is a statement, other than one made by the declarant while testifying at a trial or hearing, offered in evidence to prove the truth of the matter asserted. Fed. R. Evid. 801(c). Such statements are not admissible unless they fall under an existing exception to the hearsay rules. Fed. R. Evid. 802.

Here, there is no question that the recordings contain numerous factual statements that were offered by the government to prove the facts asserted therein. In other words, they were hearsay, and are inadmissable unless they fall within some available exception. "Excited utterances" have long been held to be an exception to the hearsay rules under the premise that a person is unlikely to fabricate lies while his mind is preoccupied with the stress of an exciting event. *United States v. Joy*, 192 F.3d 761, 766 (7th Cir. 1999). Rule 803(2) defines an "excited utterance" as a "statement relating to a startling event or condition, made while the declarant was under the stress of the excitement caused." Fed. R. Evid. 803(2). In determining that the statements properly qualify as excited utterances, we focus on three things: (1) whether a startling event occurred; (2) whether the declarant made the statement while under the stress and excitement caused by the event; and, (3) whether the statement relates to the startling event. *See United States v. Zizzo*, 120 F.3d 1338, 1355 (7th Cir. 1997).

Here, each of these three factors is present. The statements were made shortly after a robbery where the victim was confronted with a large gun. Naturally, a shorter time period between the event and the statement renders the statement more likely to

be an excited utterance than the product of deliberative thought. It follows that a person robbed at gunpoint on a random morning will be in an excited state for at least some period of time afterward. In this case, the 911 call and conversation with Ross and the police were made within minutes when Shears was still under the excitement caused by the robbery. Finally, the statements provided basic information about the event so that the police could provide immediate assistance. For this reason, the statements qualify as excited utterances and are an exception to the hearsay rules.

For these reasons, there was no error in admitting Shears's 911 call, his statements to police officers, and his statements to Ross. The order of conviction entered by the district court is AFFIRMED.