[Cite as *Cleveland v. Merritt*, 2016-Ohio-4693.]

# Court of Appeals of Ohio

EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA

JOURNAL ENTRY AND OPINION
**No. 103275**

## CITY OF CLEVELAND

PLAINTIFF-APPELLEE

vs.

## DANNY E. MERRITT

DEFENDANT-APPELLANT

**JUDGMENT:**
AFFIRMED

Criminal Appeal from the
Cleveland Municipal Court
Case No. 2015 CRB 007946

**BEFORE:** S. Gallagher, J., Stewart, P.J., and Laster Mays, J.

**RELEASED AND JOURNALIZED:** June 30, 2016

**ATTORNEY FOR APPELLANT**

Thomas A. Rein
820 West Superior Avenue, Suite 800
Cleveland, Ohio    44113


**ATTORNEYS FOR APPELLEE**

Barbara A. Langhenry
Director of Law
City of Cleveland-Law Department
601 Lakeside Avenue
Room 106
Cleveland, Ohio    44114

By: Jonathan L. Cudnik
City of Cleveland
Assistant Prosecuting Attorney
Justice Center, 8th Floor
1200 Ontario Street
Cleveland, Ohio    44113

SEAN C. GALLAGHER, J.:

**{¶1}** Danny E. Merritt appeals his misdemeanor domestic violence conviction, presenting two claims of error: (1) that the victim's statements to police officers admitted at trial violated the Confrontation Clause, and (2) that there was insufficient evidence to support the domestic violence charge. Although this case implicates constitutional principles of great importance, it was not presented as such by Merritt, from whom we received limited briefing that was based on an overruled Ohio Supreme Court decision and ignored case law from this district. We are not appellate advocates and have no obligation to independently research and present arguments in favor of reversal that were not provided by an appellant. App.R. 16(A)(7). After considering Merritt's arguments, we affirm the conviction.

**{¶2}** In the early morning hours, the police responded to a domestic violence call at a residence on East 154th Street a couple of minutes after receiving the report from dispatch. Tr. 8:4-6. The identity of the caller is unknown. Upon arrival, after a delay of several minutes before the residents answered the door, the police observed the victim, upset and crying, with bruises on her face, a black eye, and a split lip. Tr. 8:19-22, 9:14-15. As the officers attempted to speak with the victim, Merritt came outside and Officer Hardy took Merritt aside. Tr. 18:22-19:5. There is no evidence in the record that the officers were aware that Merritt was the attacker at that moment. The victim, upon being pulled aside by Officer Buettner, hysterically related that Merritt had struck her and smashed her head against the wall after the victim and Merritt returned home

together from a bar and had an argument. Tr. 11:3-13. The victim calmed down only after speaking with Officer Buettner. Tr. 15:3-7.

{¶3} Officer Hardy initially went with Merritt after the parties were separated, but he also spoke with the victim approximately a half hour after the assault took place. Tr. 19:8-13, 19:19-23. Officer Hardy's testimony, as to the content of any statements made by the victim, is not included in the transcript. Tr. 19:24-20:3 (recorded as inaudible). There is no evidence that the officers conducted a joint interview of the victim. From the record, it appears both officers interviewed the victim separately.

{¶4} Both officers did interview Merritt, who claimed that after he and the victim returned home late that evening, the victim caused the injuries to herself during their argument. Tr. 13:18-22. It is therefore undisputed that the injuries occurred immediately before the police officers arrived and that both the victim and the defendant lived at the address. Upon the police officers' testimony, Merritt was found guilty of domestic violence in violation of R.C. 2919.25(A), a misdemeanor of the first degree. The victim did not testify. Merritt is not challenging his sentence, only the finding of guilt. We will address his assigned errors in reverse order.

{¶5} In his second assignment of error, Merritt complains that there is insufficient evidence supporting his conviction. We disagree. A claim of insufficient evidence raises the question whether the evidence is legally sufficient to support the verdict as a matter of law. *State v. Thompkins*, 78 Ohio St.3d 380, 386, 1997-Ohio-52, 678 N.E.2d 541. In reviewing a sufficiency challenge, "[t]he relevant inquiry is whether, after

viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt."

*State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus.

{¶6} R.C. 2919.25(A) provides that no person shall knowingly cause physical harm to a family or household member. Division (F) further provides that a "family or household member" includes any person living as a spouse who is residing or has resided with the offender. *Id.* It is important to note that Merritt's argument on this issue is entirely based on the short, conclusory assertion that

> there is no evidence that [the victim] and Appellant are related or *are married or were ever married*. There is no evidence that they are related. There is no evidence that [the victim] *ever resided with Appellant*. Therefore, [the victim] does not qualify under any of the definitions [in R.C. 2919.25(F)].

(Emphasis added.) Such a summarily stated argument is insufficient to demonstrate error pursuant to App.R. 16(A)(7). Merritt is arguing against a straw man. The city never claimed that Merritt and the victim were married or related. Marriage or a familial relationship is not a prerequisite to proving a domestic violence charge, and therefore, the lack of evidence supporting that fact is not dispositive, or even relevant in this case. Further, there is evidence that they resided together when considering the evidence in a light most favorable to the city. Both the victim and Merritt considered the residence their "home." *See State v. McGlothan*, 138 Ohio St.3d 146, 2014-Ohio-85, 4 N.E.3d 1021, ¶ 15 (the state need not prove a shared familial and financial responsibility when the victim stated she lived at the particular address). We also note that the booking sheet

indicated that Merritt lived at, and the criminal complaint was served to, the same address on East 154th Street to which the victim's trial subpoena was issued. Merritt does not challenge, nor has he ever challenged, whether Merritt and the victim were living as spouses. *State v. Tate*, 140 Ohio St.3d 442, 2014-Ohio-3667, 19 N.E.3d 888, ¶ 21 (appellate courts should not decide cases on unbriefed issues). As a result, we must find no merit to the second assignment of error.

{¶7} In his first assignment of error, Merritt claims that his right to confront the victim was violated because her statements to responding police officers were testimonial based on the Ohio Supreme Court's decision in *State v. Clark*, 137 Ohio St.3d 346, 2013-Ohio-4731, 999 N.E.2d 592, which interpreted and applied *Crawford v. Washington*, 541 U.S. 36, 53-54, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004).

{¶8} The Confrontation Clause generally precludes the introduction of testimonial statements at trial. *Crawford* at 54. Although the Supreme Court has not defined what constitutes a "testimonial" statement, it has been held to apply to "'prior testimony at a preliminary hearing, before a grand jury, or at a former trial, and responses to police interrogations.'" *State v. Dixon*, 4th Dist. Scioto No. 15CA3680, 2016-Ohio-1491, ¶ 45, quoting *State v. Mills*, 2d Dist. Montgomery No. 21146, 2006-Ohio-2128, ¶ 17.

{¶9} We begin our analysis with two notions. "[N]ot all those questioned by the police are witnesses and not all 'interrogations by law enforcement officers' * * * are subject to the Confrontation Clause." *Michigan v. Bryant*, 562 U.S. 344, 355, 131 S.Ct.

1143, 179 L.Ed.2d 93 (2011), quoting *Davis v. Washington*, 547 U.S. 813, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006). And, "[a] 911 call * * * *and at least the initial interrogation conducted in connection with a 911 call*, is ordinarily not designed primarily to 'establish or prove' some past fact, but to describe current circumstances requiring police assistance." (Emphasis added.) *Davis*, 547 U.S. at 827. There is no dispute in this case that the statements being challenged were elicited from the victim immediately after police responded to a call of domestic abuse. The sole question is whether the officers' response in pulling Merritt aside, after Merritt approached them but before the officers began to put preliminary questions to the battered victim, is a dispositive factor to overcome the presumption that an initial inquiry made in connection to a 911 call is ordinarily designed to describe current circumstances. We find that factor alone is not dispositive in situations like this, where the identity of the attacker is unknown to police officers at the time of the initial inquiry.

{¶10} Whether statements to police officers are testimonial depends on the primary purpose of the interrogation. "[S]tatements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of interrogation is to enable police assistance to meet an ongoing emergency." *Davis* at 817. An ongoing emergency can exist after the original threat to the victim has ceased to exist if there is a potential threat to police or the public, or the victim is in need of emergency medical services. *Byrant* at 376. An ongoing emergency also can exist after the actual threat to the victim has ceased if authorities must determine whether to

release the victim back into a potentially abusive environment. *Ohio v. Clark*, 576 U.S.___, 135 S.Ct. 2173, 2181, 192 L.Ed.2d 306 (2015).

{¶11} It is important to distinguish the two sets of the victim's statements to be analyzed in this case: (1) those made to Officer Buettner upon the initial inquiry and before the victim calmed herself, and (2) those made to Officer Hardy about 30 minutes after the assault and after the victim calmed down. The record demonstrates that Officer Buettner and Officer Hardy independently interviewed the victim. A conversation beginning as an interrogation to determine the need for emergency assistance can evolve into testimonial statements. *Davis* at 828. The shift may occur if it becomes clear that no emergency exists or no emergency medical services are necessary, or if the offender is disarmed, surrenders, is arrested, or flees with no prospect of harming the victim again or the public. *Id.* Under the relevant law, the victim's initial statements could be nontestimonial in nature, even if later statements are deemed testimonial. In light of the fact that Officer Hardy's testimony regarding the victim's statements is not included in our appellate record, our focus is on Officer Buettner's testimony. If Officer Buettner's testimony is admissible, any error in the admission of Officer Hardy's duplicative testimony would be harmless. Crim.R. 52.

{¶12} The issue before this court, therefore, is whether the primary purpose of Officer Buettner's interrogation was to enable police assistance to meet an ongoing emergency. Relying on the overturned decision in *State v. Clark*, Merritt maintains that the police interrogation served the primary purpose of investigating past conduct for

future litigation because the police officers ended the emergency situation by arriving and separating the parties. *Clark*, 137 Ohio St.3d 346, 2013-Ohio-4731, 999 N.E.2d 592. If only it were that simple. The outer bounds of what is considered an "ongoing emergency" is not defined, and is instead based on a "highly context-dependent inquiry." *Bryant*, 562 U.S. 344, 363, 131 S.Ct. 1143, 179 L.Ed.2d 93.

{¶13} To begin with, the Supreme Court's analysis in *Hammon v. Indiana*, consolidated with *Davis*, 547 U.S. 813, 829, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006), does not support Merritt's inflexible proposition that separating the victim from the abuser in domestic violence cases ends the ongoing emergency in every situation. *Hammon* is distinguishable. In *Hammon*, the police officers arrived and witnessed no signs of abuse or of any crime having occurred. *Davis* at 829-830. The victim, during the initial inquiry, was not hysterical and told officers she was fine and not in any danger. *Id.* The alleged abuser confirmed the lack of an emergency. *Id.* The officers then asked the victim again about the abuse, but this time in a more formal setting and for the purpose of obtaining a battery affidavit. *Id.* Only then did any incriminating information surface in the form of a battery affidavit signed while the victim and abuser were interrogated in separate rooms. *Id.*; *State v. Sanchez*, 8th Dist. Cuyahoga Nos. 93569 and 93570, 2010-Ohio-6153, ¶ 16 (recognizing in part that *Hammon* was based on the fact that the victim stated no emergency existed); *Toledo v. Green,* 2015-Ohio-1864, 33 N.E.3d 581, ¶ 12-14 (6th Dist.) (in *Hammon*, the statements excluded were made to

police officers in the battery affidavit that police elicited after all parties, who were separated, told the responding officers that no emergency existed).

{¶14} Importantly, the Supreme Court determined that the statements were testimonial based in large part on the fact that the police officers specifically testified that they intended to use the elicited statements for investigatory purposes and the statements were procured through a formal interrogation. The statements surrounding the battery affidavit, not the initial statements to the police officers, were excluded.[1] *Id.* This important distinction frequently gets overlooked in the attempt to distill the lengthy analysis of *Hammon* into a succinct statement of law. *See, e.g., State v. Steele*, 8th Dist. Cuyahoga No. 91571, 2009-Ohio-4704, ¶ 22 (statements made to officers in the ambulance were testimonial because the ongoing emergency ceased because the initial threat to the victim abated). *Hammon* does not support an argument that separating the victim from the abuser necessarily results in the statements being deemed testimonial in all cases.

{¶15} For this proposition, Merritt relies on *State v. Clark*, in which the Ohio Supreme Court reversed a conviction after concluding that a child's statements about past

---

[1] The inadmissible statements in *Hammon*, unlike the ones being challenged in the current case, were elicited after a second attempt to question the victim at the crime scene. It must be remembered that the initial inquiry, and thus the initial statements, produced no incriminating evidence in *Hammon*. Only after receiving exculpatory statements from the victim did police officers separate the parties and precluded the husband from attending the wife's interrogation. It was under those circumstances that the wife signed the battery affidavit. *Davis*, 547 U.S. at 834 ("We have determined that, absent a finding of forfeiture by wrongdoing, the Sixth Amendment operates to exclude Amy Hammon's affidavit.").

abuse were testimonial. In a two-paragraph syllabus, the court held that (1) there was no ongoing emergency due to the timing of the interrogation and (2) a teacher acting in furtherance of her statutory duty is an agent of the state for law-enforcement purposes. *Clark*, 137 Ohio St.3d 346, 2013-Ohio-4731, 999 N.E.2d 592. We, evidently along with the dissent, find *Clark* to be largely inapplicable. Because Merritt believes differently, however, we must address the decision.

{¶16} If there is any analysis from *Clark* that can inform our decision, it is that the Ohio Supreme Court's bright-line conclusion — that no ongoing emergency existed because the interrogation was not to extricate the child from an emergency situation or to obtain urgently needed medical attention — was overruled. *Ohio v. Clark,* 576 U.S.___, 135 S.Ct. 2173, 2181, 192 L.Ed.2d 306 (2015). In reversing, the Supreme Court held that an ongoing emergency existed because the authorities had to determine whether to release the victim back into the potentially abusive environment after observing objective signs of abuse. *Id.* at 2181. As the Supreme Court concluded, and contrary to the Ohio Supreme Court's decision, the "statements occurred *in the context of an ongoing emergency involving suspected child abuse.*" (Emphasis added.) *Id.* "The immediate concern was to protect a vulnerable child who needed help. * * * As in *Bryant*, *the emergency * * * was ongoing*, and the circumstances were not entirely clear" at the time of the interrogation. (Emphasis added.) *Id.* After discussing the nature of the ongoing emergency, it was held that the victim's answers were "primarily aimed at identifying and ending the threat. [And] [t]hough not as harried, the conversation here

was also similar to the 911 call in *Davis*." *Id.* The questions were not to record evidence for future prosecution, but instead, were "meant to identify the abuser in order to protect the victim from future attacks." *Id.* The interrogators' belief that police would act on the information obtained to arrest the defendant was deemed to be irrelevant to the Confrontation Clause analysis. *Id.*

{¶17} Thus, the interrogation occurring in *Ohio v. Clark* was primarily concerned with assessing the ongoing emergency, which can exist after the actual threat to the victim has ceased if authorities must determine whether to release the victim back into the potentially abusive environment, and to determine who posed that threat to the victim. The primary purpose of such an inquisition was not investigating the crime for future litigation. Although other factors (such as the age of the victim, the fact that a teacher was the interrogator instead of law enforcement, and the historical exception for hearsay relating to children) were discussed, the Supreme Court expressly forewarned that such factors merely "fortified," and thus did not control, the court's conclusion. *Id.*

{¶18} With that in mind, and when our focus is on whether an ongoing emergency can exist during the time the victim is temporarily separated from the later-identified abuser, there is little distinction between the immediate and informal interrogation by police officers questioning a battered and vulnerable adult upon responding to a domestic violence call, and the interrogation by the teacher of a young abused child in *Clark*. Both cases involved determining the primary purpose behind the authorities' interrogation of a victim in an abusive situation. Both cases involved the authorities' initial

determination of whether extricating the victim from the situation was necessary. Although the age of the victim and status of the interrogator weighs on the analysis, it is not dispositive. Officer Buettner's interrogation was not objectively for investigative purposes solely because police officers arrived and separated the parties. The ongoing emergency does not cease merely because police officers arrive, or the victim is not currently being abused or is temporarily separated from the later-identified abuser.

{¶19} If there were any remaining doubt about our conclusion, panels from this court have maintained that separation between a victim and the attacker is not dispositive of the ongoing emergency determination. As those panels implicitly recognized, whether an ongoing emergency exists is an inquiry not readily refined into a simple proposition that the police responded or the parties were separated, and therefore, the emergency ceased. *See, e.g., Cleveland v. Williams*, 8th Dist. Cuyahoga No. 101588, 2015-Ohio-1739, ¶ 21 (ongoing emergency was still in progress even though the offender left the scene because the assault occurred moments before the police responded and the victim was injured and in an excited state); *Sanchez*, 8th Dist. Cuyahoga Nos. 93569 and 93570, 2010-Ohio-6153, ¶ 20 (domestic abuse victim's statements to responding officers were not testimonial even though the offender was not present at the scene because the abuse occurred moments before the police response, and that constituted an ongoing emergency); *Steele*, 8th Dist. Cuyahoga No. 91571, 2009-Ohio-4704, ¶ 22 (victim statements made to responding officers were nontestimonial in nature because the officers' questions were posed upon initial contact with the victim and under

circumstances for which an ongoing threat existed); *see also State v. Brown*, 8th Dist. Cuyahoga No. 87651, 2006-Ohio-6267, ¶ 21.

{¶20} In *Cleveland v. Colon*, 8th Dist. Cuyahoga No. 87824, 2007-Ohio-269, ¶ 23, for example, it was concluded that an ongoing emergency existed because the offender, convicted of domestic violence, left the scene before the police arrived but the victim was bleeding, upset, and crying when officers first made contact. Two neighbors witnessed a man beating their neighbor and called for police assistance. *Id.* at ¶ 3. Upon the arrival of the police, the offender fled, and it is not clear whether police were able to arrest him at that time or in the near future. *Id.* Regardless, either the attacker was in custody or had departed when police officers found and secured the safety of the victim found with objective signs of abuse. *Id.* at ¶ 5. The victim was hysterical and related to officers what had occurred, which was later deemed admissible through the officer's testimony. *Id.* The panel distinguished the circumstances from those in *Hammon*, concluding that

> Unlike the circumstances in *Hammon*, the incident had just concluded when the officer arrived, the defendant had just fled the scene and had not been secured by the police, and the victim was hurt, bleeding and crying. The circumstances objectively indicate that the primary purpose of the interrogation was to enable the police to assist the victim in an ongoing emergency.

*Id.* at ¶ 20; *Colon v. Taskey*, 414 Fed.Appx. 735, 738-739 (6th Cir.2010) (despite the factual differences between *Cleveland v.Colon* and other cases, the Eighth District's application of constitutional law was not unreasonable when the Sixth Circuit sitting en banc determined that in an arguably analogous situation, the statements were also nontestimonial); *see also United States v. Hayden*, 612 Fed.Appx. 381, 384 (7th Cir.2015)

(statements were nontestimonial because the statements were made to provide police officers with basic information, were made within minutes of the crime, and only provided basic information that enabled the police to arrest the offender).

{¶21} The current facts differ from *Colon* in one respect: the responding officers had the offender in custody upon arriving to the scene. The officers were simply not aware of that fact, however, until after having the initial conversation with the victim. Otherwise, as in *Colon*, police officers responded to a domestic abuse call only to find a bruised, bleeding, and battered victim upon arrival. Before Officer Buettner could begin the initial inquiry, Merritt appeared and approached the officers. Only then was Merritt separated from the victim. Accordingly, the distinction between this case and *Colon* is not significant in light of the fact that we must review the facts and circumstances at the time the statements were made. That a *post hoc* review reveals the officers had secured the offender immediately upon their arrival should not bog down the analysis. *State v. Pettway*, 8th Dist. Cuyahoga No. 91716, 2009-Ohio-4544, ¶ 77 (responding officers "had no way of knowing" whether the attacker fled the crime scene until after initially questioning the witness); *Whittaker v. Lafler*, 639 F.Supp.2d 818, 828 (E.D.Mich.2009) (no reasonable officer could arrive at a scene while the victim was hysterical from the threat recently made without perceiving that an emergency still existed); *Craig v. Hunt*, W.D.N.C. No. 3:08CV523-1-MU, 2009 U.S. Dist. LEXIS 13842, *10 (Feb. 23, 2009) (the responding officers could not have knowledge of the risks to the victim or

themselves unless they questioned the victim to determine the situation that the officers entered).

{¶22} Our conclusion is fortified by the fact that the questioning was informal — the victim had been simply pulled aside at the then active crime scene; and when Officer Buettner questioned the victim, he was not aware of the perpetrator's identity or location, whether the perpetrator possessed a weapon, whether others were involved or posed a danger to the public, or whether the scene was secure. Only basic information describing the circumstances of the police response was elicited. At the time Merritt was pulled aside, the officers had no way of knowing who Merritt was and how he was involved. To determine that, they needed to ask the victim for basic information vital to an effective police response. *See, e.g., United States v. Solorio*, 669 F.3d 943, 953 (9th Cir.2012) (officers' statements to others during a sting operation were nontestimonial because the intent of relaying information was to provide the other officers with information pertaining to armed suspects' movements, not to record information for use at trial). Moreover, Officer Buettner was also not able to determine the seriousness of the victim's injuries until after speaking with her. That the information obtained could be used in a future prosecution is irrelevant. *Clark,* 576 U.S.___, 135 S.Ct. 2173, 192 L.Ed.2d 306, at 2181.

{¶23} Finally, unlike in *Hammon*, there was no testimony from Officer Buettner indicating a subjective belief that his initial inquiry was for investigative purposes. Objectively reviewing the record, Officer Buettner's primary purpose for making the

initial inquiry was to ascertain whether police or medical assistance was necessary and to determine the identity of the alleged offender in order to secure the scene, not to investigate the crime for future prosecution. It cannot be concluded that the primary purpose was to investigate past conduct at that point in time. *See Johnson v. Adams*, E.D.Cal. No. CIV S-09-1396 LKK DAD P, 2011 U.S. Dist. LEXIS 68816, *68 (June 23, 2011) (statements in police reports made by victim were not testimonial because the purpose of the reports was to seek police assistance in ending the abuse).

{¶24} Merritt is seeking a bright-line rule — that an initial inquiry occurring immediately after the officers' arrival, but after separating a domestic abuse victim from the later-identified offender, automatically ends the ongoing emergency so that none of the statements from the initial inquiry are admissible. *See State v. Cooper*, 8th Dist. Cuyahoga No. 96635, 2012-Ohio-355, ¶ 7 (even though the statement at issue was not prompted by police interrogation — the witness volunteered information to responding officers before they even exited the cruiser — the statement was nonetheless testimonial because the officers' arrival signaled the end of any ongoing emergency and the primary purpose of the statement was for recording past events); *but see Nunez v. Bitter*, C.D.Cal. No. CV 12-10800-JVS (PLA), 2015 U.S. Dist. LEXIS 69950, *34 (Feb. 26, 2015) (the unknown declarant volunteered information to responding officers and was not subject to interrogation so that the statements did not implicate the Confrontation Clause); *Castellanos v. Small*, C.D.Cal. No. CV 08-06478 JVS (AN), 2009 U.S. Dist. LEXIS 124011, *24 (Dec. 9, 2009) (the police officer was not interrogating the witness, who

volunteered information before the officer could ask a question, and the primary purpose test from *Davis* was not applicable). Although the Supreme Court rejected the "implication that virtually any 'initial inquiries' at the crime scene" will be nontestimonial, the Supreme Court did not hold the opposite either — that all questions at the crime scene will yield testimonial answers. *Davis*, 547 U.S. at 832. "'[O]fficers called to investigate need to know whom they are dealing with in order to assess the situation, the threat to their own safety, and possible danger to the potential victim.'" *Id.*, citing *Hiibel v. Sixth Judicial Dist. Court*, 542 U.S. 177, 186, 124 S.Ct. 2451, 159 L.Ed.2d 292 (2004). As the Supreme Court has rejected bright-line rules of application, so do we.

{¶25} Courts cannot throw out every statement made to a responding officer by instituting an overly broad application of the Confrontation Clause. At the time Officer Buettner questioned the victim, the officers were rightfully concerned about the victim's and their own safety. The officers had just responded to a domestic abuse call and were simply inquiring into the present circumstances necessitating their response. The fact that Merritt had been detained during this process is irrelevant when the officers were unaware of his involvement in the crime at the time of Officer Buettner's initial inquiry.

{¶26} Merritt has not addressed *Ohio v. Clark* nor the case law from our district, and therefore, he has not presented any arguments supported by the applicable case law upon which we could fully evaluate the constitutional question. By relying solely on the overturned decision in *State v. Clark*, Merritt has not demonstrated that the primary

purpose of the interrogation was for investigative purposes. Further, we reject Merritt's notion that the responding police officers' action in informally separating the victim from her later-identified abuser upon arriving at the scene of the crime automatically ends the ongoing emergency for the purposes of the primary purpose analysis. The first assignment of error must be overruled.

{¶27} Having overruled both of the assignments of error, we affirm Merritt's conviction.

It is ordered that appellee recover from appellant costs herein taxed. The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the municipal court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.


SEAN C. GALLAGHER, JUDGE

ANITA LASTER MAYS, J., CONCURS;
MELODY J. STEWART, P.J., DISSENTS WITH SEPARATE OPINION


MELODY J. STEWART, P.J., DISSENTING:

{¶28} Contrary to the majority's opinion, the city did not present any evidence at trial establishing that the victim was a "family or household member," and Merritt's argument on this point is not a straw man. In order for Merritt to commit such a logical fallacy, the city must first have asserted some argument or evidence in support of the victim being a family or household member, for which Merritt would then have to rebut by misrepresentations. However, the city utterly failed to provide evidence sufficient to argue this point — that is precisely Merritt's contention on appeal. And contrary to the majority's opinion, I do not believe that Merritt's argument on this point was insufficient pursuant to App.R. 16(A)(7) to demonstrate error. Merritt raised the error, and said that there was no evidence in the record that the victim was Merritt's family or household member. This statement is true. It is hard to imagine what more the majority wanted Merritt to do, since there were no facts to analyze in the record and it was the city's burden to establish the facts as an element of the crime.

{¶29} R.C. 2919.25(F) states that:

(1) "Family or household member" means any of the following:

(a) Any of the following who is residing or has resided with the offender:

(i) A spouse, a person living as a spouse, or a former spouse of the offender;

(ii) A parent, a foster parent, or a child of the offender, or another person related by consanguinity or affinity to the offender;

(iii) A parent or a child of a spouse, person living as a spouse, or former spouse of the offender, or another person related by consanguinity or affinity to a spouse, person living as a spouse, or former spouse of the offender.

(2) "Person living as a spouse" means a person who is living or has lived with the offender in a common law marital relationship, who otherwise is cohabiting with the offender, or who otherwise has cohabited with the offender within five years prior to the date of the alleged commission of the act in question.

**{¶30}** Although it is true that the city never claimed that Merritt and the victim were married or related, it also never claimed or presented evidence that the victim and Merritt were "living together as spouses" either by "cohabitation" or "common law marriage." It was as if the city altogether forgot that the victim's "family or household" membership was an element of the offense that it needed to establish.

**{¶31}** While the majority goes out of its way to find that there was sufficient evidence by stating that "[b]oth the victim and Merritt considered the residence their 'home,'"— implying that this is sufficient to establish that the victim resided with Merritt and they therefore were living together as spouses — this is a disingenuous recounting of the facts. It is important to point out that the majority makes the determination that both parties considered the residence their "home" based on Officer Buettner's third-person recounting of what Merritt and the victim told him when he arrived and separately interrogated the parties. According to Officer Buettner's trial testimony, the victim told him that she and Merritt got into an argument after returning home from a bar and that Merritt struck her. When Buettner interviewed Merritt, Merritt corroborated the fact that

they came home from the bar and got into an argument, but maintained that the victim's injuries were self-inflicted.

**{¶32}** It is common knowledge that the word "home" is a negotiable term that has many meanings in common parlance. It can mean anything from the place where a person is lying down for the night to a place where a person has been domiciled for his entire life. With this limited third-party testimony, one should not conclude — as the majority so easily does — that Merritt and the victim both lived at the address where the police responded.

**{¶33}** Nevertheless, even if one could determine that the victim and Merritt resided together based the officer's use of the word "home," this determination would only satisfy one part of the two-prong test for establishing whether the victim is a family or household member. Establishing that the victim is a family or household member of the offender requires that the city establish two things: 1) that the victim is "residing" or "has resided" with the offender, *see* R.C. 2919.25(A)(1)(a), and 2) that the victim and the offender are involved in a relationship described in R.C. 2919.25(A)(1)(a)(i)–(iii). "Living as a spouse," satisfies the requisite relationship requirement. *See* R.C. 2919.25(A)(1)(a)(i). "Living as a spouse" as defined in the statute requires that the victim be in a common law marital relationship with the offender, or that the victim is otherwise cohabitating with the offender. *See* R.C. 2919.25(A)(2).

**{¶34}** In *State v. McGlothan*, 138 Ohio St.3d 146, 2014-Ohio-85, 4 N.E.3d 1021, the Supreme Court explained that when the victim does not share a residence with

offender, the essential elements of cohabitation are (1) sharing of familial or financial responsibilities and (2) consortium. *Id.* at ¶ 13, citing *State v. Williams*, 79 Ohio St.3d 459, 463-465, 683 N.E.2d 1126 (1997). However, when the city establishes that both the victim and offender share a single residence, it is not necessary that the city prove that the parties shared familial or financial responsibilities in addition to consortium, rather, cohabitation may be established by showing that the victim and the offender live together[2] and are in a relationship from which the domestic violence arose. *McGlothan* at ¶ 17. For example, these elements were met in *McGlothan* when the victim testified at trial that the offender was her boyfriend and had lived with her in her apartment for about a year.

{¶35} The majority cites to *McGlothan* in support of its holding that there was sufficient evidence of cohabitation in this case, but I fail to see how it is helpful. Here, unlike in *McGlothan*, the victim did not testify, and the city presented no evidence that the victim and Merritt lived together or that they shared familial or financial responsibilities, or that they were in any significant relationship from which one could conclude that they were living together as spouses. For all we know, the victim and

---

[2] Although not explicitly stated in its opinion in *McGlothan*, the Supreme Court appears to be drawing a distinction between "residing together" and "living together." Residing together, which is a necessary element of being a family or household member, *see* R.C. 2919.25(A)(1)(a), is a broad term which encompasses living situations where the victim might not share a permanent residence with the offender but spends significant portions of time with the offender at a certain residence because of their relationship to one another. *See, e.g., Williams* at 464-465 (interpreting former analogous statute to R.C. 2919.25(A)(1)(a) and stating, "[The] offense of domestic violence, as expressed in R.C. 2919.25(E)(1)(a) and related statutes, arises out of the relationship of the parties rather than their exact living circumstances."). On the other hand, "living together" is more akin to being domiciled together, i.e., living permanently together in one location. *See, e.g., McGlothan* at ¶ 15.

Merritt could have been college roommates, friends, acquaintances, coworkers, or even strangers who were spending the night together. Even with the clarification of the *Williams* factors in *McGlothan*, the Supreme Court has remained consistent in its insistence that the offense of domestic violence is one that derives from "the *relationship* between the perpetrator and the victim," (emphasis added) *Williams* at 462, and "not the fact that the parties happen to share one address." *Id.* at 463; *McGlothan* at ¶ 17. Where, as here, there is no evidence or testimony regarding the relationship between the parties, the court could not conclude that a domestic violence offense occurred.

{¶36} Lastly on this point, the majority notes that the booking sheet in the record on appeal indicated that Merritt's address was the same address where the police responded on the night of the incident and is the same address to which the victim's subpoena was sent — yet none of this information was introduced, admitted through testimony or documentary evidence, or was able to be challenged at trial. In a bench trial, a court must consider only that evidence that has been properly admitted when making its determination of guilt. *See State v. Evans*, 8th Dist. Cuyahoga No. 85396, 2005-Ohio-3847, ¶ 66. It is therefore troubling that the majority would mention this information when it has no bearing on whether the city presented sufficient evidence of every element of the offense at trial.[3]

---

[3] Notably, the city does not argue that the information should be considered on appeal. Rather, the majority simply decides to consider it.

**{¶37}** Regarding Merritt's confrontation argument, every criminal defendant, no matter how egregious the allegations against him or her are, is entitled to certain basic constitutional guarantees. Chief among them is the Sixth Amendment right to confront one's accusers at trial. Today, the majority erroneously finds that the victim's statements to police were nontestimonial. In doing so, the majority achieves the result of holding Merritt accountable for his actions, but does so at the expense of narrowing Merritt's confrontation right so drastically that he effectively has none.

**{¶38}** In this case, Merritt's trial attorney objected to the city's use of the victim's statements at trial on the basis that they violated Merritt's right to confrontation. That very same argument was presented to this court and supported by seminal cases on the issue. Our standard of review in this case is de novo. *United States v. Larson*, 495 F.3d 1094, 1102 (9th Cir.2007). Under this standard, we must review the record and relevant case law to determine whether, under the totality of relevant circumstances, the statements at issue were testimonial. *See Ohio v. Clark*, 576 U.S.__, 135 S.Ct. 2173, 2180, 192 L.Ed.2d 306 (2015).

**{¶39}** The Supreme Court announced the primary purpose test in *Davis v. Washington*, *Hammon v. Indiana*, 547 U.S. 813, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006), when the court concluded that

> Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the

primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.

*Id.* at 822.

**{¶40}** The court expounded upon the test in *Michigan v. Bryant*, 562 U.S. 344, 131 S.Ct. 1143, 179 L.Ed.2d 93 (2011). Although it reiterated that when "the primary purpose of an interrogation is to respond to an 'ongoing emergency,' its purpose is not to create a record for trial" and therefore not subject to the confrontation clause, *id.* at 358, the court also emphasized that courts must objectively evaluate "all of the relevant circumstances" when determining whether a statement is testimonial. *Id.* at 369. In doing so, it noted that "the existence vel non of an ongoing emergency is not the touchstone of the testimonial inquiry." *Id.* at 374. Rather, "whether an ongoing emergency exists is simply one factor — albeit an important factor — that informs the ultimate inquiry regarding the 'primary purpose' of an interrogation." *Id.* at 366.

**{¶41}** Relevant factors to consider when determining whether there is an ongoing emergency include: whether the dispute is public or private, whether the perpetrator's location is known versus unknown, whether the motive(s) of the perpetrator are known, the type of weapon(s) involved, whether the perpetrator is armed, whether physical violence is presently occurring, the seriousness of the victim's injuries, whether the parties have been separated, whether medical intervention is necessary, the danger posed to the public, the demeanor of the parties, whether police officers are presently on the scene, and whether the scene is secured. *See generally Bryant*.

**{¶42}** In addition to whether there is an ongoing emergency, other relevant considerations to the primary purpose test include the formality versus informality of the encounter, *Clark*, 576 U.S.__, 135 S.Ct. 2173, 192 L.Ed.2d 306, and the statements and actions of both the declarant and the interrogators, in light of the circumstances in which the interrogation occurs; *Bryant* at 360.

**{¶43}** When looking at the relevant factors laid out in *Davis*, *Hammon*, and *Bryant*, it is clear that there was no ongoing emergency in this case. When the officers arrived at the apartment, they were aware that the situation involved a domestic dispute between a male and female. Therefore, from the beginning, the police were on notice that this was a matter involving a purely private dispute. Accordingly, upon arrival, the officers had only to address the threat to the victim and themselves. Any threat to the victim and police was immediately dispelled prior to police questioning when Merritt met the officers at the door calm and unarmed, and then by all accounts voluntarily submitted himself to the police.

**{¶44}** If there were any remaining concerns about the victim's safety, it ended when the police separated Merritt and the victim after arriving at the residence. The officers testified that they separated Merritt from the victim by placing him in the back of the police cruiser. Although the timing of the separation is not explicitly disclosed, it is more than reasonable to infer from the officers' testimony that the parties were separated prior to questioning.[4] Contrary to the majority's dismissal of Merritt's separation

---

[4] The implication arises from Officer Buettner's testimony that he interviewed the victim first

argument, *supra* at ¶ 12, the Supreme Court specifically stated in *Bryant*, that where the assailant is "'armed only with his fists when he [attacks the victim] removing [the victim] to a separate room [is] sufficient to end the emergency.'" *Bryant,* 562 U.S. 344, 131 S.Ct. 1143, 179 L.Ed.2d 93, citing *Davis*, 547 U.S. at 830-832, 126 S.Ct. 2266, 165 L.Ed.2d 224. Likewise, placing Merritt in the back of a police car while the victim remained with police outside, ended any emergency in this case.

**{¶45}** The police officers' own actions belie the majority's theory that the police were unaware, at the time they questioned the victim, that Merritt was the victim's abuser. Merritt was the only other person with the victim when the police arrived. He was the apparent assailant, and the police officers' actions in immediately separating the two parties establishes that they knew this as well.

**{¶46}** In deciding that the victim's statements were nontestimonial, the majority also relies heavily on prior cases from this district that also conclude that there was an ongoing emergency when officers promptly arrived to a scene where there was an injured and upset victim. Those cases fail to address the totality of the relevant circumstances when deciding the primary purpose of the interrogation and rely only on the victim's appearance and demeanor in concluding that the interrogation was conducted in order to meet an ongoing emergency. In doing so they ignore Supreme Court case law that

___

and then interviewed Merritt second, together with Officer Hardy's testimony that he stayed with Merritt after separating the parties, then interviewed the victim after about 30 minutes. From this testimony, it appears that the officers took turns interviewing the parties and that an officer remained with each separated party at all times.

explains that the victim's physical state is insufficient, on its own, to create an emergency situation. *Id.* at 369. As the court explained in *Bryant*,

> A victim's medical condition is important to the primary purpose inquiry to the extent that it sheds light on the victim's ability to have any purpose at all in responding to police questions and on the likelihood that any such purpose would be a testimonial one. It also provides important context for first responders to judge the existence and magnitude of a continuing threat to the victim, themselves, and the public.

*Id.* at 364-365.

**{¶47}** In contrast to the present case, the victim in *Bryant* was in a grave medical condition when the police arrived at the scene and began questioning him. *Id.* at 375. The victim, who was suffering from a mortal gunshot wound to the abdomen, kept asking the police during their questioning of him when emergency medical attention would arrive. *Id.* The court concluded that the extent of the victim's injuries, together with the tremendous amount of pain he was in, mitigated against the statements being testimonial, because it was unlikely that the victim, in that moment, ever contemplated that his statements would be used at a later prosecution. *Id.*

**{¶48}** Here, neither officer felt that the victim's injuries were severe enough to warrant immediate medical assistance. In fact, rather than calling for an ambulance or insisting that they take the victim to a hospital, the officers tried to convince the victim to let them take pictures of her injuries and fill out a misdemeanor complaint form — which she declined to do. Tr. 13:1–6. Accordingly, the victim's injuries were not so severe that this court can say, as the court did in *Bryant*, that the victim did not understand that her statements would be relevant to a later criminal prosecution. Indeed, the victim was

fully aware that she was speaking with police when she relayed the past events of the assault. Even if the victim spoke with the police solely for the purpose of having Merritt removed and arrested, she surely knew that her account was potentially relevant to a later criminal prosecution. *Accord Bryant* at 382 (Scalia, J., dissenting).

{¶49} Further, while recognizing that police officers have the dual responsibility of responding to emergencies and investigating crimes, the fact that the physical assault had ceased and the apparent assailant was present when the police arrived, shows that the police were not responding to a perceived emergency but were rather questioning the victim to determine what happened and to decide whether to make an arrest. At that point, any inquiries the police had were investigatory and aimed at learning past facts relevant to a potential criminal case against Merritt.

{¶50} Lastly, the majority mischaracterizes the Supreme Court's decision in *Clark*, 576 U.S.__, 135 S.Ct. 2173, 192 L.Ed.2d 306, in order to support its conclusion that the victim's statements were nontestimonial. In *Clark*, the court considered all of the relevant circumstances when determining whether the primary purpose of a teacher's interrogation of a small child was to gather facts potentially relevant to a later prosecution. The relevant circumstances the court considered were the following: 1) the victim was a three-year-old whose tender age allowed him no basis for understanding that his testimony was potentially relevant to the later prosecution of his abuser/guardian; 2) historically, statements made by child victims not competent to testify were excepted from the purview of the Confrontation Clause; 3) that the interrogation was informal

because it was conducted by teachers, not law enforcement officials; and 4) the teachers' purpose for questioning the child was to determine whether it was safe to release the victim to his guardian at the end of the day, not to gather facts for later prosecution. It was only after careful consideration of these four factors that the court concluded that the three-year-old's statements were nontestimonial. The court never stated, nor implied, that an emergency is ongoing simply because a police officer wants or needs to determine whether to release a victim back into a potentially abusive environment.

{¶51} The majority's comparison of this case to *Clark* is also of great concern. The majority states "there is little distinction between the immediate and informal interrogation by police officers questioning a battered and vulnerable adult upon responding to a domestic violence call, and the interrogation by the teacher of a young abused child in *Clark*." *Supra* at ¶ 18. This statement, and its ensuing explanation, is subterfuge. It is designed to dupe one into believing that two, largely incomparable cases are one and the same and therefore deserve similar outcomes.

{¶52} In *Clark*, the court explained that the interrogators' status as teachers, rather than law enforcement officers, was "highly relevant" to its determination that the victim's statements were nontestimonial. Specifically, the court stated:

> Courts must evaluate challenged statements in context, and part of that context is the questioner's identity. *See id.* at 369, 131 S.Ct. 1143, 179 L.Ed.2d 93. Statements made to someone who is not principally charged with uncovering and prosecuting criminal behavior are significantly less likely to be testimonial than statements given to law enforcement officers. *See, e.g., Giles*, 554 U.S. at 376, 128 S.Ct. 2678, 171 L.Ed.2d 488. It is common sense that the relationship between a student and his teacher is very different from that between a citizen and the police. We do not ignore

that reality. In light of these circumstances, the Sixth Amendment did not prohibit the State from introducing [the child's] statements at trial.

{¶53} The case before us is exactly the type of case that the Supreme Court was wary of in *Clark*, i.e., a case where a person is disclosing facts to a police officer who is principally charged with uncovering criminal behavior for prosecution. As the court decidedly concludes, when a police officer is doing the questioning, the statements elicited are more likely to be testimonial, a factor that weighs in favor of finding the victim's statements testimonial here.

{¶54} Moreover, the justices were quick to distinguish the facts of *Clark* from other cases it had reviewed concerning domestic violence and the Confrontation Clause. The court stated:

> When [the child's] teachers noticed his injuries, they rightly became worried that the 3-year-old was the victim of serious violence. Because the teachers needed to know whether it was safe to release [the child] to his guardian at the end of the day, they needed to determine who might be abusing the child. Thus, the immediate concern was to protect a vulnerable child who needed help. * * * [The] circumstances were not entirely clear. [The child's] teachers were not sure who had abused him or how best to secure his safety. Nor were they sure whether any other children might be at risk. As a result, their questions and [the child's] answers were primarily aimed at identifying and ending the threat. Though not as harried, the conversation here was also similar to the 911 call in *Davis*. The teachers' questions were meant to identify the abuser in order to protect the victim from future attacks. Whether the teachers thought that this would be done by apprehending the abuser or by some other means is irrelevant. And the circumstances in this case were unlike the interrogation in *Hammon*, where the police knew the identity of the assailant and questioned the victim after shielding her from potential harm.

*Clark* at 2181.

{¶55} Unlike the circumstances in *Clark* and *Davis*, but like those in *Hammon*,[5] the police officers in this case knew the identity of the apparent assailant and questioned the victim after shielding her from harm.  Moreover, unlike in *Clark*, the victim here was an emancipated adult, not a child, and her abuser was not her guardian.  Simply put, collecting past facts in order to determine whether to arrest Merritt — the obvious assailant — on charges of domestic violence is categorically different from teachers asking a vulnerable three-year-old child questions about the identity of his abuser who was unknown at the time of questioning.  I therefore dissent.

---

[5] It is important to note that the police in *Hammon*, like here, were also responding to a call for a domestic disturbance and did not obtain affirmative confirmation that the apparent assailant was the offender until after separating the parties and speaking with the victim.  Nevertheless, when discussing *Hammon* in the *Clark* opinion, the Supreme Court appears to impute knowledge of the offender's identity to the police even prior to separating the parties.  *Clark* at 2181 (stating, "[a]nd the circumstances in this case were unlike the interrogation in *Hammon*, where the police knew the identity of the assailant and questioned the victim after shielding her from potential harm.").